UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

Plaintiff,

v.

D-1 DAWN HANNA,
D-2 DARRIN HANNA,

Defendants.
_____/

Case: 2:07-cr-20355
Assigned To: Steeh, George Caram
Referral Judge: Scheer, Donald A
Filed: 07-19-2007 At 09:22 AM
INDI USA V. SEALED MATTER (2 DFT) T
AM

VIOLATIONS: 18 U.S.C. §§ 2, 371, 981(a)(1)(C), 982(a)(1), 1956(h),1001(a)(2), 28 U.S.C. § 2461(c), 50 U.S.C. § 1705(b)

## INDICTMENT

THE GRAND JURY CHARGES

### COUNT 1

(Conspiracy – 18 U.S.C. § 371, 50 U.S.C. § 1705(b))

D-1 DAWN HANNA

D-2 DARRIN HANNA

**I.   INTRODUCTORY ALLEGATIONS**

At all times material to this Indictment:

1. Defendants DAWN HANNA and DARRIN HANNA were United States citizens and residents of the Eastern District of Michigan.

2. Defendant DAWN HANNA was an employee of Technology Integration Group Services, Inc. ("TIGS"), located at 360 South Street, Suite 201, Rochester, Michigan.

3. Defendant DAWN HANNA was responsible for international sales and marketing at TIGS.

4. Defendant DARRIN HANNA was the founder, president, and sole owner of TIGS.

5. Defendants DAWN HANNA and DARRIN HANNA were siblings.

6. Emad Yawer operated a company in Amman, Jordan called Advanced Technical Systems ("ATS"). ATS was affiliated with another Jordanian firm called Dresser International Group ("Dresser"), which was managed by Yawer's associate, Walied Al-Aly.

7. On August 2, 1990, Iraq invaded Kuwait. In response to that invasion, President George H. W. Bush signed Executive Orders 12722 and 12724 which, pursuant to the International Emergency Economic Powers Act, Title 50, United States Code, Section 1701, *et seq*, declared a national emergency and effectively prohibited all trade and business transactions with Iraq, including "[a]ny dealing by a United States person related to . . . property intended for . . . exportation to Iraq from any country, or any activity of any kind that promotes or is intended to promote such dealing." The Secretary of the Treasury subsequently issued the Iraqi Sanctions Regulations, implementing Executive Orders 12722 and 12724.

8. Thereafter, the Presidents of the United States continued to declare, on an annual basis, the national emergency with respect to Iraq. On or about May 23, 2003, the United States lifted certain economic sanctions imposed on Iraq and on or about July 29, 2004, the President declared the national emergency with regard to Iraq to be over.

## II. THE CONSPIRACY

9. Beginning in or about December, 2001, and continuing until July 18, 2007, in the Eastern District of Michigan, Southern Division and elsewhere, defendants DAWN HANNA and

2

DARRIN HANNA conspired and agreed with each other and others known and unknown to the Grand Jury, to commit the following offenses against the United States:

(1) To knowingly and willfully export property from the United States to Iraq, in violation of 50 U.S.C. § 1705(b), Executive Order 12722 and 12724, and 31 C.F.R. § 575.205.

(2) To knowingly and willfully deal in property intended for exportation to Iraq and to engage in activity promoting such dealing, in violation of 50 U.S.C. § 1705(b), Executive Order 12724, and 31 C.F.R. § 575.206.

(3) To knowingly and willfully perform contracts in support of a commercial project in Iraq, in violation of 50 U.S.C. § 1705(b), Executive Order 12722 and 12724, and 31 C.F.R. § 575.209.

(4) To knowingly and willfully engage in transactions for the purpose of evading and avoiding the United States embargo against Iraq, in violation of 50 U.S.C. § 1705(b), Executive Order 12722 and 12724, and 31 C.F.R. § 575.211.

### A. MANNER AND MEANS OF THE CONSPIRACY

It was part of the conspiracy that:

10. Defendants DAWN HANNA and DARRIN HANNA received requests from Yawer to obtain pricing and technical information about a mobile cellular telecommunications system, also referred to as Global System for Mobile Communication ("GSM"), and other equipment for export to Iraq.

11. Defendants DAWN HANNA and DARRIN HANNA received such requests and endeavored to obtain, and did in fact obtain, the pricing and technical information for Yawer.

12. Defendants DAWN HANNA and DARRIN HANNA endeavored to procure GSM telecommunications equipment and other equipment for Yawer for shipment to Iraq.

13. Defendants DAWN HANNA and DARRIN HANNA issued purchase orders, entered into contracts, paid suppliers, and arranged and paid for shipment of GSM telecommunications equipment and other equipment to Syria, knowing that the ultimate destination of the equipment was Iraq.

14. Defendants DAWN HANNA and DARRIN HANNA traveled overseas to meet with Yawer and suppliers.

15. Defendants DAWN HANNA and DARRIN HANNA received approximately $9.5 million from their illegal dealings with Iraq, which they used to pay suppliers, pay Yawer and pay themselves substantial profit.

16. Defendants DAWN HANNA and DARRIN HANNA used various methods to conceal and disguise their unlawful conduct, including: falsifying shipping, banking and other documents; lying to suppliers about the true destination of the equipment; shipping the equipment through third countries; and lying to United States and foreign government investigators about their activities.

**B. OVERT ACTS**

17. In furtherance of the conspiracy, and for the purpose of effecting its unlawful objectives, defendants DAWN HANNA and DARRIN HANNA, and other unindicted co-conspirators, committed overt acts, in the Eastern District of Michigan, Southern Division, and elsewhere, including, but not limited to, the following:

4

(1) On or about December 4, 2001, defendant DAWN HANNA prepared a fax to "Ahmed" for transmittal to Baghdad, Iraq, in which she enclosed "a few questions regarding the Mobile GSM Telecomm system."

(2) On or about January 14, 2002, defendant DAWN HANNA prepared a letter to "Ahmed" in which she stated "we are prepared to begin working with you on the Mobile Telecomm GSM project."

(3) On or about February 10, 2002, Yawer sent defendant DAWN HANNA a list of required GSM telecommunications equipment and instructed her to send him technical specifications and prices for the equipment.

(4) Beginning in or about February, 2002, defendant DAWN HANNA attempted to obtain, and did obtain, pricing and technical information on GSM telecommunications equipment for Yawer from telecommunications suppliers.

(5) On or about February 15, 2002, defendant DAWN HANNA informed defendant DARRIN HANNA of her activities and stated that she had "the final pricing on the GSM stuff for IQ by ATS."

(6) On or about February 18, 2002, defendant DAWN HANNA informed Yawer that in dealing with suppliers she was "keeping confidential the nature of our project for obvious reasons," that "[s]ome areas are blacklisted, as you well know due to politics and such climate," and that she was obtaining the "best pricing without specifically detailing where the items are going, because of the fact that three other major suppliers have turned down the quoting and sale of the items because it is not U.N. approved."

(7) On or about February 25, 2002, defendant DAWN HANNA instructed Yawer to create a "home made" document showing that "your trading company has a license to install a mobile GSM system in JORDAN." Defendant DAWN HANNA further instructed Yawer to "get creative . . . I want to see how good the document reproduction efforts can be." According to defendant DAWN HANNA, the purpose of the fraudulent license was to "show the vendors that when they ship to Jordan (we will handle the freight forward to destination location of use in IQ), someone qualified can work with the stuff."

(8) On or about February 25, 2002, Yawer sent defendant DAWN HANNA the fraudulent document.

(9) On or about February 25, 2002, defendant DAWN HANNA told Yawer that the fraudulent document looked "GORGIOUS" [sic] and that she would "add some final touches on to it."

(10) On or about February 26, 2002, defendant DAWN HANNA asked Yawer if he could issue a letter of credit to pay for the GSM telecommunications equipment and stated "don't tell me it is from the Central Bank of Iraq."

(11) On or about March 13, 2002, defendant DAWN HANNA sought pricing information from an individual overseas and told the individual that there was " a lot of work" in Iraq "provided we can 'slip' in now and get a piece of the action."

(12) On or about May 2, 2002, defendants DAWN HANNA and DARRIN HANNA opened an account at Comerica Bank for the purpose of receiving and transferring proceeds from their illegal export of GSM telecommunications and other equipment to Iraq.

(13)     On or about August 1, 2002, defendant DAWN HANNA discussed with defendant DARRIN HANNA and Yawer how to inflate the price of the GSM telecommunications equipment and sought defendant DARRIN HANNA's and Yawer's agreement to divide the profit according to "a 50-50 split on a per item basis."

(14)     On or about August 1, 2002, Dresser, via its bank in Amman, Jordan, issued an approximately $4.9 million letter of credit with TIGS as the beneficiary. The letter of credit covered the sale of GSM telecommunications equipment "as per contract No. ESY/6X7/2002 Dated 22 July 2002 Between TIGS and Dresser International Group (ATS)."

(15)     In or about September, 2002, defendant DAWN HANNA began negotiating the purchase of GSM telecommunications equipment from two companies in the United Kingdom, UK Company 1 and UK Company 2.

(16)     In or about September, 2002, defendant DAWN HANNA began negotiating the purchase of global positioning systems ("GPS") and other equipment from a company in the United States, US Company 1.

(17)     On or about September 3, 2002, defendant DARRIN HANNA reviewed documents and agreements related to the purchase of GSM telecommunications equipment. Defendant DARRIN HANNA instructed defendant DAWN HANNA to sign certain agreements on behalf of TIGS and told her that "all purchase orders must be issued with my authorization until we have completed a number of transactions and I am at a level of comfort with a different arrangement."

(18)     On or about September 19, 2002, Dresser, via its bank in Amman, Jordan, issued an approximately $4.95 million letter of credit with TIGS as the beneficiary.

(19) On or about September 20, 2002, defendant DAWN HANNA told an employee at UK Company 1 that the GSM telecommunications equipment was destined for Turkey.

(20) On or about September 23, 2002, defendant DAWN HANNA sent a purchase order to UK Company 1 for GSM telecommunications equipment worth approximately $850,000.

(21) On or about September 23, 2002, defendant DAWN HANNA instructed an employee of US Company 1 to submit a fraudulent document to a bank in New York so that TIGS could obtain payment under the first letter of credit.

(22) In or about October, 2002, documents were submitted by TIGS to a bank in New York for payment of approximately $4,446,000 under the first letter of credit, including drafts, weight lists, packing lists and invoices signed by defendant DARRIN HANNA.

(23) On or about October 11, 2002, approximately $2.8 million in proceeds from the first letter of credit were transferred from a bank in New York to the TIGS Comerica account.

(24) On or about October 15, 2002, approximately $1.5 million in proceeds from the first letter of credit were transferred from a bank in New York to UK Company 1 at TIGS's request.

(25) On or about October 15, 2002, GSM telecommunications equipment was collected from UK Company 1 for export from the United Kingdom.

(26) From on or about October 17, 2002, to on or about December 31, 2002, approximately $1.6 million in proceeds from the first letter of credit were transferred from the TIGS Comerica account to Yawer's bank accounts in Jordan, the United Arab Emirates, and the United Kingdom.

(27) On or about November 14, 2002, TIGS sent UK Company 1 a purchase order for approximately $226,487 worth of additional GSM telecommunications equipment.

(28) On or about November 18, 2002, defendant DAWN HANNA met in the United Kingdom with an employee from UK Company 1. During the meeting, defendant DAWN HANNA provided UK Company 1 with a copy of the equipment list that Yawer had provided her in February, 2002. Defendant DAWN HANNA also agreed to purchase approximately $926,500 in additional GSM telecommunications equipment.

(29) On or about November 22, 2002, TIGS sent UK Company 1 a purchase order for approximately $926,500 worth of GSM telecommunications equipment.

(30) In or about December, 2002, defendant DAWN HANNA helped arrange, and was kept informed about, the travel and the training on the GPS equipment that an individual from Iraq received in the United States from US Company 1.

(31) On or about December 10, 2002, defendant DAWN HANNA and Yawer met in the United Kingdom with employees of UK Company 1 and UK Company 2.

(32) On or about December 10, 2002, during the meeting with employees of UK Company 1 and UK Company 2, defendant DAWN HANNA requested that UK Company 1 transfer approximately $24,000 to a freight forwarder in the United Kingdom, UK Freight Forwarder 1.

(33) On or about December 17, 2002, TIGS transferred approximately $200,000 from its Comerica account to UK Company 2 in the United Kingdom to purchase GSM telecommunications equipment.

(34) On or about December 19, 2002, defendant DAWN HANNA informed defendant DARRIN HANNA about the status of additional payments that were expected under the first letter of credit.

(35) On or about December 20, 2002, approximately $371,000 in proceeds from the first letter of credit were transferred from a bank in New York to the TIGS Comerica account.

(36) On or about December 31, 2002, TIGS transferred approximately $10,000 from its Comerica account to UK Freight Forwarder 1 in the United Kingdom.

(37) In or about December, 2002, defendant DAWN HANNA negotiated a contract with a company in Germany to purchase approximately $850,000 worth of GSM telecommunications equipment located in Germany.

(38) On or about January 6, 2003, UK Freight Forwarder 1 shipped GSM telecommunications equipment on behalf of TIGS from the United Kingdom to Syria.

(39) On or about January 7, 2003, GSM telecommunications equipment was shipped on behalf of TIGS from Germany to Syria.

(40) On or about January 14, 2003, defendant DAWN HANNA received instructions from Yawer to ship equipment from the United States to Syria.

(41) On or about January 20, 2003, GSM telecommunications equipment was shipped on behalf of TIGS from Germany to Syria.

(42) On or about January 27, 2003, documents were submitted by TIGS to a bank in New York for payment of approximately $4.95 million under the second letter of credit, including drafts, a weight list, and invoices signed by defendant DARRIN HANNA.

(43) On or about January 30, 2003, defendant DAWN HANNA submitted an air waybill to a bank in New York to obtain payment under the second letter of credit.

(44)    On or about February 7, 2003, defendants DAWN HANNA and DARRIN HANNA met in the United Kingdom with an employee of UK Company 1 to negotiate and sign a contract for the purchase of GSM telecommunications equipment.

(45)    On or about February 14, 2003, a shipment of the GPS and other equipment was detained in the United States by the United States Customs Service.

(46)    In or about late February, 2003, additional GSM telecommunications equipment from UK Company 1, UK Company 2, and other suppliers was being prepared by UK Freight Forwarder 1 on behalf of TIGS for export from the United Kingdom to Syria.

(47)    On or about February 28, 2003, defendant DAWN HANNA told a United States Customs agent that the ultimate destination for the GPS and other equipment detained in the United States was Turkey, Jordan or Syria. Defendant DAWN HANNA also told the United States Customs agent that she was not aware of any illicit trade with Iraq and that she was not doing any illicit trade with Iraq.

(48)    On or about March 3, 2003, the British Government stopped the shipment of GSM telecommunications equipment that was being prepared for export from the United Kingdom to Syria.

(49)    On or about March 4, 2003, defendant DAWN HANNA stated to a United Kingdom Customs Officer that the shipment of GSM telecommunications equipment that had been stopped was destined for Turkey.

(50)    On or about March 19, 2003, defendant DARRIN HANNA stated to a United Kingdom Customs Officer that Dresser was ATS' customer and the end user for the equipment detained in the United Kingdom.

(51) On or about April 21, 2003, approximately $4.8 million in proceeds from the second letter of credit were transferred from a bank in New York to the TIGS Comerica account.

(52) On or about May 2, 2003, defendant DAWN HANNA told Yawer that TIGS would send him $1.5 million "in chunks," rather than "do the full $1.5M at a crack," because it "[l]ooks better."

(53) On or about May 4, 2003, defendant DAWN HANNA instructed a TIGS employee to transfer $1.5 million to Yawer's bank account.

(54) From on or about May 1, 2003, through on or about June 6, 2003, a total of approximately $3.7 million in proceeds from the second letter of credit were transferred from a TIGS bank account to Yawer's bank accounts in Spain, the United Arab Emirates, and the United Kingdom.

(55) On or about May 28, 2003, defendant DAWN HANNA received from Yawer a letter to an employee of UK Freight Forwarder 1 that stated "I would like to take this opportunity to thank you for your help and support in shipping our goods to Iraq via Syria. Your contacts in Syria were most helpful in shifting the goods speedily and promptly, once again our thanks and appreciations." The name Walied Al-Aly was typed on the signature line of the letter.

(56) On or about December 9, 2003, defendant DARRIN HANNA stated in a letter to a U.S. Congressman that the purchaser of the GPS equipment detained in the United States was in Jordan.

All in violation of Title 18, United States Code, Section 371 and Title 50, United States Code, Section 1705(b).

## COUNTS 2 - 7

(International Emergency Economic Powers Act – 50 U.S.C. § 1705(b))

D-1 DAWN HANNA

D-2 DARRIN HANNA

1. Paragraphs 1 through 8 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

2. On or about each of the dates specified below, within the Eastern District of Michigan, Southern Division, and elsewhere, defendants DAWN HANNA and DARRIN HANNA, being United States persons, unlawfully, knowingly, and willfully, dealt in property intended for exportation to Iraq, and engaged and attempted to engage in activity intended to promote such dealing, without having first obtained prior authorization from the Secretary of the Treasury.

| Count | Date | Transaction |
|---|---|---|
| Count 2 | October 15, 2002 | Shipment of GSM telecommunications equipment from the United Kingdom to Iraq. |
| Count 3 | January 6, 2003 | Shipment of GSM telecommunications equipment from the United Kingdom to Iraq via Syria. |
| Count 4 | January 7, 2003 | Shipment of GSM telecommunications equipment from Germany to Iraq via Syria. |
| Count 5 | January 20, 2003 | Shipment of GSM telecommunications equipment from Germany to Iraq via Syria. |
| Count 6 | February 14, 2003 | Attempted shipment of GPS and other equipment from the United States to Iraq. |
| Count 7 | March 3, 2003 | Attempted shipment of GSM telecommunications equipment from the United Kingdom to Iraq via Syria. |

All in violation of Title 50, United States Code, Section 1705(b); Title 18, United States Code, Section 2; and Title 31, Code of Federal Regulations, Sections 575.206 and 575.211.

## COUNT 8

(Money Laundering Conspiracy – 18 U.S.C. § 1956(h))

D-1 DAWN HANNA

D-2 DARRIN HANNA

1. Paragraphs 1 through 8 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

2. From a date unknown to the Grand Jury, but from at least on or about October 11, 2002, and continuing thereafter until on or about June 6, 2003, in the Eastern District of Michigan, Southern Division, and elsewhere, defendants DAWN HANNA and DARRIN HANNA conspired and agreed with each other and others known and unknown to the Grand Jury, to knowingly:

   (1) conduct and attempt to conduct one or more financial transactions affecting interstate and international commerce, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and which, in fact, involved the proceeds of specified unlawful activity, specifically, the unlawful dealing in property intended for export to Iraq, in violation of Title 50, United States Code, Section 1705(b), with the intent to promote the carrying on of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

   (2) transport, transmit, and transfer, and attempt to transmit, transport, and transfer a monetary instrument and funds from a place in the United States to a place outside the United States, specifically, the United Kingdom, with the intent to promote the carrying on of specified unlawful activity, specifically, the unlawful dealing in property intended for export to Iraq, in violation of Title 50, United States Code, Section 1705(b), in violation of 18 U.S.C. § 1956(a)(2)(A); and

14

(3)   engage and attempt to engage in monetary transactions within the United States in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, specifically, the unlawful dealing in property intended for export to Iraq, in violation of Title 50, United States Code, Section 1705(b), in violation of 18 U.S.C. § 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 9

( Forfeiture – 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1))

D-1 DAWN HANNA

D-2 DARRIN HANNA

1. Upon conviction of one or more of the offenses alleged in Counts 2-7 of this Indictment, defendants DAWN HANNA and DARRIN HANNA shall forfeit to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violation, including but not limited to the following, a sum of money in United States currency equal to the amount of proceeds obtained as a result of the offense, 50 U.S.C. § 1705, for which the defendants are jointly and severally liable.

2. Upon conviction of the offense alleged in Count 8 of this indictment, the defendants, DAWN HANNA and DARRIN HANNA, jointly and severally, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal involved in such offense, and all property traceable to such property, including, without limitation, the total amount laundered, as to which the United States may request a forfeiture money judgment.

3. If any of the property described in paragraphs 1 and 2 hereof as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendants --

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred to, sold to, or deposited with a third party;

    c.    has been placed beyond the jurisdiction of this Court;

    d.    has been substantially diminished in value; or

16

  e.  has been commingled with other property which cannot be divided without difficulty;

the United States of America, pursuant to Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), intends to seek forfeiture of all other property of the defendants up to the value of the forfeitable property described in paragraphs 1 and 2.

  All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); and Title 28, United States Code, Section 2461(c).

## COUNT 10

(False Statements – 18 U.S.C. § 1001(a)(2))

D-1 DAWN HANNA

1. Paragraphs 1 through 8 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

2. On or about February 28, 2003, in the Eastern District of Michigan, Southern Division, and elsewhere, in a matter within the jurisdiction of the Department of Treasury, United States Customs Service, an agency of the executive branch of the United States government, defendant DAWN HANNA knowingly and willfully made a materially false statement to an agent of the United States Customs Service, in that defendant DAWN HANNA stated that she was not aware of any illicit trade with Iraq and that she was not doing any illicit trade with Iraq, when, in fact, defendant DAWN HANNA then and there was aware of illicit trade with Iraq and was doing illicit trade with Iraq.

In violation of Title 18, United States Code, Section 1001(a)(2).

THIS IS A TRUE BILL

*Eunice Bickel-Smith*
Foreperson

STEPHEN J. MURPHY
United States Attorney


/s Eric M. Straus
Eric M. Straus
Assistant Chief, Criminal Division


/s Barbara L. McQuade
Barbara L. McQuade
Assistant U.S. Attorney


/s Philip A. Ross
Philip A. Ross
Assistant U.S. Attorney


/s Michael C. Martin
Michael C. Martin
Trial Attorney
U.S. Department of Justice

Dated:

Barbara McQuade, AUSA, (313) 226-9725

| United States District Court<br>Eastern District of Michigan | Criminal Case C( | Case: 2:07-cr-20355<br>Assigned To: Steeh, George Caram<br>Referral Judge: Scheer, Donald A<br>Filed: 07-19-2007 At 09:22 AM<br>INDI USA V. SEALED MATTER (2 DFT) T<br>AM |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to c

### Companion Case Information

This may be a companion case based upon LCrR 57.10 (b)(4)[1]:

☐ Yes   ☒ No

**Companion Case Number:**

**Judge Assigned:**

**AUSA's Initials:** _BM_

Case Title: USA v.   D-1 DAWN HANNA, et al.

County where offense occurred :   Oakland

Check One:   ☒ Felony   ☐ Misdemeanor   ☐ Petty

_X_ Indictment/____Information --- no prior complaint.
____Indictment/____Information --- based upon prior complaint [Case number:
____Indictment/____Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

### Superseding Case Information:

**Superseding to Case No:** _____   **Judge:** _____

☐   Original case was terminated; no additional charges or defendants.
☐   Corrects errors; no additional charges or defendants.
☐   Involves, for plea purposes, different charges or adds counts.
☐   Embraces same subject matter but adds the additional defendants or charges below:

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

July 18, 2007
Date

BARBARA L. McQUADE (P45423)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: (313) 226-9725
Fax: (313) 226-4679
E-Mail address: barbara.mcquade@usdoj.gov

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/20/04